**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| D.H. Porter Enterprises, LLC, | * | |
| Plaintiff / Counter-Defendant, | * | |
| v. | * | |
| Marcellus McKinley, | * | Civil No. DRM-23-02069 |
| Defendant / Counter-Plaintiff, | * | |
| v. | * | |
| David Porter, et al., | * | |
| Third-Party Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OPINION

This case arises from a soured employment relationship between Marcellus McKinley and his sister and brother-in-law Hope and David Porter and their companies (collectively, "the Porter Parties").[1] The primary issue in this case is commissions either overpaid or underpaid to McKinley during his employment.

The Porter Parties move this Court for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, both offensively on their claim for declaratory judgment that McKinley was not contractually entitled to the commissions at issue, and defensively on McKinley's counter- and third-party claims seeking allegedly unpaid amounts under statutory,

[1] In this opinion, "D.H. Porter" refers to Plaintiff and Counterclaim Defendant D.H. Porter Enterprises, LLC, and "The Porter Parties" refers collectively to D.H. Porter and Third-Party Defendants Staffing Plus Unlimited, Inc. ("Staffing Plus"), Hope Porter, and David Porter. "McKinley" refers to Defendant and Counterclaim / Third-Party Plaintiff Marcellus McKinley.

contractual, and quasi-contractual theories. ECF No. 107 (Partial Summary Judgment Motion); ECF No. 107-1 (memorandum in support). McKinley has responded, ECF No. 110, and the Porter Parties have replied to that response. ECF No. 111. After considering the motion, response, reply, and exhibits in the record, the Court finds that no hearing is necessary.[2] Loc. R. 105.6. For the reasons set forth below, the Porter Parties' motion is DENIED in all respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

D.H. Porter is a Maryland LLC which does business as Staffing Etc., with its principal office in Prince George's County. ECF No. 5 at 1. It is engaged in the staffing business and specializes in placing health care professionals and administrative staff on assignments at government agencies, hospitals, school systems, health centers, and private corporations. *Id.* at 2. Hope Porter was the CEO of D.H. Porter on all dates relevant to this case, and both she and David Porter, her husband, performed at least some management for D.H. Porter and / or Staffing Plus.[3] ECF No. 107-8 at 1; ECF No. 84 at 2. McKinley is a resident and domiciliary of Virginia and is Hope Porter's brother. ECF No. 75 at 1; ECF No. 107-8 at 1.

In August 2014, McKinley was offered a Director of Business Development position with Staffing Etc. as a 1099 independent contractor and began work that year. ECF No. 110-2; ECF No. 107-1 at 17. In February 2016, the parties signed a one-page memorandum (the "2016 Memo") outlining the ability for McKinley to earn commissions "for business development activities" based on evidence of five criteria, referred to as the Sales Verification Activity List, or "SVAL." ECF No. 110-3. By its terms, the 2016 Memo "covers the period of January 1, 2016 through

---

[2] The parties voluntarily consented for this matter to be referred to a United States Magistrate Judge for all proceedings under 28 U.S.C. § 636(c). ECF No. 32. This case was reassigned to the undersigned on April 7, 2025.

[3] Staffing Plus is separately incorporated, but also operates under the trade name "Staffing Etc." ECF No. 76 at 2.

December 31, 2016." *Id.* Later that month, the parties executed an employment agreement (the "2016 Employment Agreement") outlining the terms of McKinley's employment. ECF No. 110-4. The 2016 Employment Agreement mentions commissions as an available form of compensation but does not specify how they are to be earned and does not reference or mention the 2016 Memo. *Id.* at 1.

In January 2017, McKinley was offered by David Porter, listed at the time as Vice President of Staffing Etc., via email, a higher salary of $95,000 per year due to his increased duties managing recruitment, along with a conversion "from a 1099 back to a W2 employee." ECF No. 110-5. Hope Porter sent a letter to McKinley on December 13, 2019 (the "December 2019 Letter") increasing his salary to a base rate of $150,000, along with an "additional layer of compensation for meeting certain measured targets in your department." ECF No. 110-13. A February 13, 2020 "Corrected Offer Letter" included the same "additional layer of compensation" language, but stated McKinley's salary as $125,000. ECF No. 110-15.[4] At some point in the period of 2017 to 2019, McKinley took on the role of Director of Talent Acquisition, in addition to his Director of Business Development title. ECF No. 107-1 at 20; ECF No. 110 at 6.

In a January 24, 2020 update to the December 2019 Letter (the "2020 Commission Agreement"),[5] McKinley was offered "additional compensation for your business development activities." ECF No. 107-4. This plan for additional compensation was based upon "all sales/contracts revenue generated by you above $1,000,000" per calendar year and contained a

[4] Because the "additional layer of compensation" language is the same in the two letters, the Court considers this provision to have been in effect as of December 13, 2019, and interprets the Corrected Offer Letter as altering the base salary provision only.
[5] The formal title of this document is "Re: Update to Offer Letter dated December 13, 2019 - Additional Compensation." The document is dated "January 24, 2019," but all parties agree that the year is a typographical error and the true date is January 24, 2020.

tiered system of commission percentages "based upon . . . first year sales or contact renewal." *Id.* The 2020 Commission Agreement also stated that "these figures represent contracts sold[6] by your primary efforts" and noted that "[a]dditional Recruitment compensation will only be for contracts where you are not the primary salesman." *Id.* According to the Porter Parties, "the same letter" was also issued to Char Talmadge, who had recently joined D.H. Porter, also with the title of Director of Business Development. ECF No. 107-1 at 4.

This is where the terms of McKinley's employment stood when the contract at issue between Public Consulting Group, Inc. ("PCG") and D.H. Porter was signed in August 2020 (the "PCG New Jersey Contract"). ECF 107-38. The contract was for D.H. Porter to serve as a subcontractor to hire up to 5,000 individuals in order to help PCG fulfill its contract with the State of New Jersey for contract tracing services. *Id.*

The relationship between D.H. Porter and PCG dates to 2018, when Jon Riley of PCG reached out to Hope Porter about the possibility of the two companies bidding together on a Maryland contract. ECF No. 107-10. Hope Porter replied with interest and cc'd McKinley on the email. ECF No. 107-11. From then and through the date the PCG New Jersey Contract was signed, D.H. Porter frequently did business with PCG, with involvement from both Hope Porter and McKinley both together and separately. *See, e.g.*, ECF 107-1 at 4-12, 19-23; ECF No. 110 at 4-5, 10-11.

According to the Porter Parties, Hope Porter is the person whose "primary efforts" resulted in the sale of the PCG New Jersey Contract. ECF No. 107-1 at 5. In an affidavit, Hope Porter states

[6] From the context, "sold" appears to include the "sale" of both new contracts and contract renewals, because of the "based upon . . . first year sales or contact renewal" language, which is repeated in the header of the first table of tiered commissions: "Year One Sales or Contract Renewal." ECF No. 107-4.

that she, and not McKinley, "originated" the PCG New Jersey Contract, and points to a series of contacts and meetings in support of her conclusion that the PCG New Jersey Contract "was sold through my primary efforts and not McKinley's." ECF No. 107-8 at 5-7. The Porter Parties have submitted as exhibits a series of emails between 2018 and 2020 showing Hope Porter's contacts with PCG, including emails about staffing opportunities for contract tracers and specific negotiations with PCG on contract tracer contracts in New Jersey and other areas. ECF No. 107-1 at 5-9; ECF Nos. 107-10 to 107-35.

According to McKinley, he took part in the initial discussions in 2018 and was the person primarily responsible for fostering partnerships and collaboration opportunities to work with PCG by maintaining a close professional relationship with PCG personnel. ECF No. 110 at 4-5. He also enters into the record a series of emails to support this claim. ECF No. 110-6 to 110-12, 110-16 to 110-18. Both he and the Porter Parties make specific mention of a company-wide email sent by Hope Porter thanking McKinley "for his continued cultivation of this relationship between PCG (the prime) and Staffing Etc over the last two years" while announcing a separate PCG contract (the "DC Contact Tracer Contract") in June 2020. ECF No. 110-19. The Porter Parties assert that this expression of thanks was based on McKinley's recruitment efforts, rather than his business development efforts, and that the DC Contact Tracer Contract was also secured by the primary efforts of Hope Porter. ECF No. 107-1 at 21.

The PCG New Jersey Contract was signed on August 7, 2020. All parties agree that, beginning either in December 2020 or in early 2021, D.H. Porter made payments, referred to as "commissions" and relating to the PCG New Jersey Contract, to McKinley. ECF No. 107-1 at 19; ECF No. 110 at 12. The sides differ, however, as to the nature of these payments.

The Porter Parties assert, supported by Hope Porter's affidavit, that on Saturday, December 12, 2020, Hope Porter, David Porter, and McKinley held a meeting (the "December 2020 Meeting"), "because McKinley mentioned that he thought he deserved to be paid commissions from the PCG New Jersey contract." ECF No. 107-1 at 12-14; ECF No. 107-8 at 10. The Porter Parties acknowledge that, at this meeting, David and Hope Porter agreed to make payments to McKinley, designated as "commissions" and calculated at a rate of thirty percent of the "net profit margin" from the PCG New Jersey Contract. ECF No. 107-1 at 12-14; ECF No. 107-8 at 10-11. However, according to the Porter Parties, and consistent with Hope Porter's affidavit, these payments were gratuitous, and made not because McKinley had met the criteria of the 2020 Commission Agreement, but because he was Hope Porter's brother and had not up to that time been paid any commissions by D.H. Porter. ECF No. 107-1 at 13-14; ECF No. 107-8 at 10. The Porter Parties assert that the Porters explicitly stated to McKinley at the December 2020 Meeting that "he did not satisfy the commissions earning criteria" and that the agreement to pay him commissions was because he was Hope Porter's brother and had not previously earned any commissions. ECF No. 107-1 at 12-13; ECF No. 107-8 at 10.

The Porter Parties additionally point to the thirty percent rate which the Porters agreed to pay McKinley during the December 2020 Meeting, when, at the time of that meeting, revenues from the PCG New Jersey Contract had not reached the $10 million revenue threshold that would trigger a 30% commission rate under the 2020 Commission Agreement, and Hope and David Porter did not know whether the revenue ever would reach that level. ECF No. 107-1 at 13-14; ECF No. 107-8 at 10-11; *see* ECF No. 107-4.

McKinley disputes that these payments were gratuitous and not earned commissions. He points to emails from just before and after the December 2020 Meeting. On December 4, 2020,

Hope Porter sent an email to Conrad Austin, identified in a later email as Controller of Staffing Etc., ECF No. 110-20 at 23, stating that she "processed a sales commission for Marc Mc[K]inley for PCG." *Id.* at 10. On December 10, she sent an email to James Marshall, the D.H. Porter accountant and advisor, stating that she was "[t]rying to create and show [McKinley's] commission. . . . Based on his latest sales plan it [is] 30% of net profit for sales in excess of $10 million. . . . Marc and Char have the same commission." *Id.* at 11.

On December 12, 2020, presumably just after the December 2020 Meeting, Hope Porter sent another email to Austin stating: "Next week let's discuss and finalize the compensation and payout for [McKinley's] sales compensation." *Id.* at 12. On December 14, McKinley sent David Porter and Hoper Porter an email with the subject line "Saturday Meeting follow up." *Id.* at 13-14. It read, in part:

> I want to thank you both for meeting with me at the office on Saturday. Your openness to discuss the [PCG New Jersey Contract], the payout amount and schedule was greatly appreciated. I wanted to summarize our meeting to ensure we're all on the same page.
>
> We agreed that the contract would pay out at a rate of 30% commission of the net profit amount after the first million dollars.
>
> We agreed that we would consider biweekly pay out based on $1.45 per hour times the total hours worked on the contract during the biweekly period.
>
> We agreed the balance of the commission would be paid out on a quarterly basis based on an analysis of the actual net profit after adjustments for health insurance and sick leave.

*Id.* Hope Porter responded the same day:

> I need to add to your analysis that the entire pricing for contract is evaluated in calculation of the commission pay out on a quarterly basis. That includes overhead calculation for the contract. The entire pricing of the contract that [affects] the net profit is to be calculated and considered. This is salaries and other costs [of] the contract that will be detailed. In essence the entire pricing of the contract not just sick leave calculation and health insurance. We also discussed there may need to be a reserve of a certain % of the sick leave amount. All if these items including

> payout whether monthly and or quarterly true up will be further outlined with Conrad/James as well.

*Id.* at 13.

After the December 2020 Meeting, McKinley began receiving commission payouts and continued to receive them through June 2022. *See* ECF No. 110-20. These payouts corresponded with frequent communication between McKinley and D.H. Porter employees about the timing and amount of payment due, all acknowledging that payment was due and often mentioning PCG, but containing additional discussion of the payment schedule and delays based on cash position or other issues. *Id.* Nothing from that correspondence indicates any dispute during this timeframe as to whether McKinley was entitled to these payouts or as to whether the payouts were to be calculated based on the revenue and net profit from the PCG New Jersey Contract. *Id.*

On July 28, 2022, Hope Porter sent a letter to McKinley terminating his employment effective June 24, 2022. ECF No 107-36. The termination letter stated that he was terminated for job abandonment and that he had never been entitled to commissions from the company's PCG business. *Id* at 1-2. The letter also stated that, after a "true up," even if McKinley were entitled to commissions, he had been overpaid and thus owed the company $184,364. *Id.* at 2.

D.H. Porter subsequently filed this action against McKinley for (as is relevant to his motion) Declaratory Judgment (Count I). Amended Complaint, ECF No. 5. McKinley brought counterclaims against D.H. Porter for (as is relevant to this motion) violation of the Maryland Wage Payment & Collection Law ("MWPCL") (Count I); Breach of Contract (Count II); Quantum Meruit / Unjust Enrichment (Count III); and Promissory Estoppel (Count IV). Second Amended Counterclaim, ECF No. 75. McKinley also brought third-party claims against the remaining Porter

Parties—each of Counts I-IV in the Amended Third-Party Complaint, ECF No. 76, mirrors its counterpart in the Second Amended Counterclaim.[7]

## II. LEGAL STANDARD

Pursuant to Rule 56, a movant is entitled to summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *See English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Anderson*, 477 U.S. at 248.

There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the Court has drawn all reasonable inferences in favor of the nonmoving party and "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted)).

The party seeking summary judgment bears the initial burden of establishing either that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is

[7] The Porter Parties do not seek summary judgment on their remaining claims in the Amended Complaint (Unjust Enrichment (Count II); Breach of Contract (Count III)), or on McKinley's remaining claims in the Second Amended Counterclaim or Amended Third Party Complaint (Wrongful Termination under the Maryland Equal Pay Act (Count V); Unlawful Failure to Provide COBRA Notice (Count VI); Violation of 26 U.S.C. § 7434 (Count VII)).

absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to meet this burden, the non-movant "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). However, in considering the motion, the Court must view all of the facts and reasonable inferences in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587; *see also English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024). Ultimately, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. ANALYSIS

The Porter Parties move for summary judgment on a portion of Count I of the Amended Complaint, ECF No. 5, on Counts I through IV of McKinley's Second Amended Counterclaim, ECF No. 75, and on Counts I through IV of McKinley's Amended Third-Party Complaint, ECF No. 76. The Court analyzes each of these below.

### A. Declaratory Judgment and Breach of Contract

The Porter Parties move for summary judgment on a portion of Count I of D.H. Porter's Complaint, seeking declaratory judgment "that Marcellus McKinley does not have a contract entitlement to commissions from the PCG New Jersey contact tracing contract entered with D.H. Porter Enterprises, LLC, d/b/a Staffing Etc." ECF No. 70 at 3.[8] They also move for summary

[8] This language corresponds roughly with paragraph B of the "wherefore" clause of Count I of the Amended Complaint. ECF No. 5 at 6. The Porter Parties do not seek summary judgment on the remainder of the declaratory relief requested in Count I.

judgment against McKinley on Count II of his Counterclaim, ECF No. 75 at 13-14, and his Third-Party Claim, ECF No. 76 at 16-17, that allege breach of contract relating to commissions owed from the PCG New Jersey Contract. Because the Porter Parties raise substantially the same arguments offensively on their Count I and defensively on McKinley's Count II, the Court reviews these together.

**1. Interpretation of the 2020 Commission Agreement**

The parties agree that Maryland law, including Maryland contract interpretation rules, applies in this case. *See, e.g.,* ECF No. 107-1 at 16, ECF No. 110 at 23.

Maryland utilizes an objective theory of interpreting contracts, that is, a contract is to be understood based upon what a reasonable person in the position of the parties would think it means:

> "Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" In other words, a court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract subjectively intended or personally thought it meant.
>
> A court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'"
>
> In other words, "the plain meaning is determined by 'focus[ing] on the four corners of the agreement.'" "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" But, Maryland courts also turn to the dictionary "'to supply contractual language with its ordinary and accepted meanings.'"

*Curio Wellness Corp. v. Hou. Specialty Ins. Co.*, No. ELH-25-0930, 2025 U.S. Dist. LEXIS 220862, at *10–11 (D. Md. Nov. 10, 2025) (internal citations omitted).

Under Maryland law, "the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Vadilal Indus. USA, Inc. v. Singh Trading*

*Co.*, No. LKG-25-2028, 2025 U.S. Dist. LEXIS 157167, at *12 (D. Md. Aug. 14, 2025) (citing *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)). The primary written contract at issue in this case is the 2020 Commission Agreement. To interpret this agreement, the Court must first determine whether any of its terms are ambiguous.

"[A] written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Bobbitt v. Weber*, No. DKC-24-2054, U.S. Dist. LEXIS 165206 at *11 (D. Md. Aug. 26, 2025) (citing *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999)). To determine ambiguity, the court should examine "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.* (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)). However, a "contract is not ambiguous 'simply because, in litigation, the parties offer different meanings to the language.'" *Id.* (quoting *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, A.2d 932, 952 (Md. 2007).

The Court finds that all terms of the 2020 Commission Agreement relevant to this motion are clear and unambiguous and that a reasonably prudent person would interpret them according to their ordinary and usual meaning, even when considering the context of the agreement at the time of execution.

The key terms at issue in the 2020 Commission Agreement are:

i. "This plan [for additional compensation for McKinley's business development activities] will be based upon all sales/contracts revenue generated by you above $1,000,000 [per calendar year]"

ii. "These figures [i.e. the dollar threshold and commission percentage tiers in the table headed "Year One Sales or Contract Renewal"] represent contracts sold by your primary efforts."

iii. "Additional Recruitment compensation will only be available for contracts where you are not the primary salesman."

The 2020 Commission Agreement represents a contract between D.H. Porter and McKinley to provide additional compensation for his business development activities by providing commissions for sales or contract revenue meeting two conditions: first, the revenues must have been "generated by" McKinley; and second, the revenues must have come from contracts "sold" (or renewed) by McKinley's "primary efforts."

As to the first condition, "generate" means "to create by means of a defined process," e.g. generating profits, and "create" means "to bring into existence" or "to produce or bring about by a course of action or behavior." *Generate*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/generate (last visited Sept. 30, 2026); *Create*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/create (last visited Sept. 30, 2026). "Revenue" is "[i]ncome from any and all sources," in this case, a specific contract. *Revenue*, BLACK'S LAW DICTIONARY (12th ed. 2024). So, for the PCG New Jersey Contract revenue to be "sales/contract revenue generated by [McKinley]" per the 2020 Commission Agreement, the revenue must have been produced at least in part by McKinley's actions or behavior.

As to the second condition, "to sell" is defined in this context as "to cause or promote the sale of." *Sell,* MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/sell (last visited September 30, 2026). It is clear from the context that "contracts sold" does not contemplate the literal sale of a contract itself (i.e. an assignment of rights under an existing contract in

exchange for money.) Rather, the thing "sold" is, more precisely, D.H. Porter's promised services, under a contract that will be executed for that purpose. This colloquial metonymic use of "contract" to stand in for the services provided under the contract would have been understood by any reasonable person in the position of the parties at the time.

"Primary" is defined in this context as "of first rank, importance, or value: principal." *Primary*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/primary (last visited Sept. 30, 2026). Therefore, for McKinley to "sell" a contract by his "primary efforts," his work must have been the principal, most important contribution to the outcome of the contract being "sold."

The meaning of the second condition is further elucidated by its context. The full paragraph states: "These figures represent contracts sold by your primary efforts. Additional recruitment compensation will only be available for contracts where you are not the primary salesman." ECF No. 107-4.[9] Logically, this means that contracts "sold by [McKinley's] primary efforts" are those contacts where he *is* "the primary salesman." In other words, his sales activities must have been the most important, principal cause of the sale or renewal of a contract.

Taken together, the two conditions mean that McKinley would only be entitled to commissions on the PCG New Jersey Contract revenue if (1) the revenue was produced at least in part by McKinley's actions or behavior; and (2) McKinley's work to sell the contract was the most important, principal cause of the sale. (The second condition is obviously narrower than the first.)

---

[9] The second sentence means, in essence, that McKinley cannot "double-dip" and earn both "additional compensation for [his] business development activities" (the subject of the 2020 Commission Agreement) and "additional recruitment compensation" for his recruiting work (not the subject of the 2020 Commission Agreement) on revenue from the same contract.

Notably absent from the 2020 Commission Agreement is any mention of the 2016 Memo or the five criteria that make up its "SVAL." The Porter Parties contend that "contracts sold by your primary efforts" was a shorthand way of incorporating the 2016 criteria into the 2020 Commission Agreement, but also contend that the same phrase is an unambiguous requirement which should be interpreted by its plain dictionary meaning based on the four corners of the 2020 Commission Agreement. *See* ECF No. 107-1 at 5; ECF No. 111 at 2-3. These arguments appear to be at odds with one another. Additionally, by its own terms, the 2016 Memo expired on December 31, 2016. Because the 2016 Memo was long expired at the time of the 2020 Commission Agreement, and because the latter document is unambiguous and makes no explicit reference to the 2016 Memo, nor any implied reference that a reasonable person in the position of the parties would consider to be incorporation of the 2016 Memo, the Court finds that neither the 2016 Memo nor any of the SVAL criteria included in it were incorporated into the 2020 Commission Agreement.

This leaves the question of whether the PCG New Jersey Contract was "generated" by McKinley or "sold by [his] primary efforts." As discussed *supra*, both the Porter Parties and McKinley have advanced arguments and evidence regarding McKinley's and others' respective roles in generating the contract, and who was primarily responsible for its sale. *See, e.g.*, ECF 107-1 at 4-12, 19-23; ECF No. 110 at 4-5, 10-11. The Porter Parties argue that Hope Porter's primary efforts led to the sale of the PCG New Jersey Contract, and they have submitted her affidavit and multiple email chains demonstrating her communications with PCG about the New Jersey and other contracts. ECF No. 107-1 at 5-9; ECF No. 107-10 to 107-35.

McKinley argues that his primary efforts were responsible for the sale, and also identifies a series of emails that he asserts demonstrate his work fostering partnerships and collaboration

opportunities to work with PCG by maintaining a close and ongoing professional relationship with them. ECF No. 110-6 to 110-12, 110-16 to 110-18. He points specifically to the company-wide email sent by Hope Porter thanking McKinley "for his continued cultivation of this relationship between PCG (the prime) and Staffing Etc over the last two years" while announcing the DC Contact Tracer Contract in June 2020, ECF No. 110-19, although the Porter Parties argue this referred to his recruitment, not business development, activities. ECF No. 107 at 21.

Reading these facts in the light most favorable to McKinley as the non-movant, there remains a genuine dispute of material fact as to whether the PCG New Jersey Contract was "generated" by McKinley, whether it was "sold by [his] primary efforts," and, therefore, whether he is entitled to commissions on it under the 2020 Commission Agreement.

**2. Waiver of the 2020 Commission Agreement's "Generated By" and "Primary Efforts" Conditions**

McKinley contends that, even if the Porter Parties had an "enforceable contractual right to refuse or deny payment of commissions to McKinley for failing to satisfy their claimed disqualifying condition(s) precedent," they waived this right. ECF No. 110 at 23. They did so, he argues, by "[a]cknowledging and confirming McKinley's contractual right to receive," and their "contractual duty to pay" commissions from the PCG New Jersey Contract, as well as by "paying or partially paying" the commissions—"even after McKinley allegedly failed to satisfy the alleged condition(s) precedent." *Id.* at 23-24.

In light of the Court's findings above, the relevant question is this: even if McKinley did not "generate" the revenue from the PCG New Jersey Contract or did not "sell" the contract by his "primary efforts," did the Porter Parties later waive their right to enforce those conditions of the 2020 Commission Agreement? In particular, did Hope and David Porter's agreement at the December 2020 Meeting to pay McKinley commissions from the PCG New Jersey Contract, and

their conduct in actually making those payments, constitute a waiver of those conditions as they pertained to the PCG New Jersey Contract?

The context of the December 2020 Meeting and surrounding correspondence is fact-specific and disputed, and, in general, the finding of a waiver is left to the fact finder. *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011) ("Indeed, the waiver inquiry requires resolution of many factual disputes and drawing of factual inferences. We look to the totality of a party's actions when determining whether waiver, or modification of the contract, has occurred.")

The definition of what constitutes a waiver, however, and when conditions may be waived, is a matter of law:

> "Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." Waiver "may result from implication and usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended." "[A]cts relied upon as constituting a waiver of the provisions' of a contract must be inconsistent with an intention to insist upon enforcing such provisions."

*Id.* (internal citations omitted). "Where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed *or excused*." *Bargale Indus., Inc. v. Robert Realty Co*., 343 A.2d 529, 533-34 (Md. 1975). Additionally, "either party to a contract may waive any of the provisions made for his benefit." *Twining v. Nat'l Mortg. Corp.*, 302 A.2d 604, 607 (Md. 1973) (citation omitted).

The "generated by" and "primary efforts" conditions were to the benefit of the Porter Parties as they restricted McKinley's ability to earn commissions and provided an incentive for him to generate new business. At the December 2020 Meeting, David and Hope Porter agreed that McKinley was to be compensated by D.H. Porter in connection with the PCG New Jersey Contract,

calling these payments "commissions," to be calculated at a rate of thirty percent of the "net profit margin," ECF No. 107-1 at 12-14; ECF No. 110 at 11, language plainly similar to that used in the 2020 Commission Agreement.[10] After the December 2020 Meeting, McKinley began receiving commission payouts and continued to receive them through June 2022. *See* ECF No. 110-20. These payouts corresponded with frequent communication between McKinley and D.H. Porter employees about the timing and amount of payment due from the commissions from the PCG New Jersey Contract. *Id.* (The Porter Parties argue that some of these communications "confirm that McKinley was being paid gratuitously and not being paid commissions as a contract entitlement." ECF No. 107-1 at 29.)

Read in the light most favorable to McKinley, this evidence creates a genuine dispute of material fact as to whether the Porter Parties waived the "generated by" and "primary efforts" conditions of the 2020 Commission Agreement through their statements and actions. For this additional reason, there is a genuine dispute of material fact as to whether McKinley was entitled to commissions on the PCG New Jersey Contract under the 2020 Commission Agreement.

**3. Non-exclusionary Nature of the 2020 Commission Agreement**

McKinley also contends that the 2020 Commission Agreement was not the exclusive means by which he could earn commissions. ECF No. 110 at 19-20 ("[The 2020 Commission Agreement] ***did not*** preclude or forbid the Porter Parties from promising McKinley a compensation plan that included McKinley's promised right to earn commissions calculated pursuant to the "net profit" methodology described within [the 2020 Commission Agreement].") McKinley's breach

[10] Of course, as discussed *supra*, the Porter Parties argue that their agreement to a 30% rate was at odds with the 2020 Commission Agreement, because the PCG New Jersey Contract revenues had not reached, and for all they knew might never reach, the dollar threshold for the 30% commission tier.

of contract claims are not limited to the 2020 Commissions Agreement. In his Counterclaim and Third-Party Claim, McKinley alleges that:

> In conjunction with [McKinley's] salary increase, through *a series of verbal conversation[s] and exchanges of documents and emails*, [the Porter Parties] and [McKinley] negotiated and mutually agreed upon terms and conditions of [the Porter Parties'] duty to pay and [McKinley's] right to receive earned commission wages promised and calculated pursuant to a mutually agreed upon matrix and methodology.

ECF. No. 75 at 4; ECF No. 76 at 6 (emphasis added).

He then alleges that "[the Porter Parties] materially breached [their] mutually agreed to binding contract with [McKinley] by withholding and failing to pay [McKinley] additional negotiated, promised, and earned commissions [arising from] [the Porter Parties'] net profit realized from the [PCG] New Jersey Contract." ECF No. 75 at 13; ECF No. 76 at 16.

The Court does not read the 2020 Commission Agreement to be the exclusive means through which McKinley could earn commissions. It does not contain any language precluding additional commissions agreements. In fact, the 2020 Commission Agreement explicitly specifies that it concerns "additional compensation for [McKinley's] business development activities" and that "additional Recruitment compensation" (not otherwise discussed in the document) may be available for contracts where McKinley was not the primary salesman. The December 2019 Letter states that additional compensation would be based upon the performance of McKinley's department, without specifying which departments McKinley was associated with or from which he could earn additional compensation. ECF No. 107-4; ECF No. 107-9. As the 2020 Commission Agreement appears to acknowledge, McKinley had roles in both business development and recruitment / talent acquisition, and used both the title "Director of Business Development" and the title "Director of Talent Acquisition." ECF 107-4; ECF No. 107-1 at 20; ECF No. 110 at 6.

The Court finds that the 2020 Commission Agreement is clearly and unambiguously non-exclusionary with regard to the means by which McKinley could earn commissions, including with respect to the PCG New Jersey Contract. Reviewing the facts in the light most favorable to McKinley as the non-movant, a reasonable fact finder could determine that, even if the 2020 Commission Agreement does not entitle McKinley to commissions for the PCG New Jersey Contract, another contract entitling McKinley to commissions was formed via the parties' "series of verbal conversation[s] and exchanges of documents and emails." ECF. No. 75 at 4; ECF No. 76 at 6.[11]

---

For the reasons discussed in this section, the Court finds that there is a genuine dispute of material fact as to whether McKinley was contractually entitled to commissions for the PCG New Jersey Contract. Accordingly, summary judgment declaring that McKinley has no contract entitlement to commissions from the PCG New Jersey Contract is not appropriate. Similarly, the Court cannot grant summary judgment in the Porter Parties' favor on McKinley's Breach of Contract claims.

### B. The Maryland Wage Payment & Collection Law ("MWPCL")

The Porter Parties move for summary judgment on Count I of McKinley's Second Amended Counterclaim, ECF No. 75 at 11-13, and Count I of his Amended Third-Party Complaint, ECF No. 76 at 15-16, each alleging violation of the Maryland Wage Payment & Collection Law ("MWPCL"), MD. CODE ANN., LAB. & EMPL., §§ 3-501 to 3-509. Section 3-505(a) of the MWPCL requires that each employer "pay an employee . . . all wages due for work that the

[11] I.e. a reasonable fact finder could determine that the parties formed an express contract on this subject, as distinct from the implied-in-fact or implied-in-law contract theories at issue in McKinley's quantum meruit / unjust enrichment claims discussed *infra.*

employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Under § 3-501, a wage means "all compensation that is due to an employee for employment" and includes "a commission" as an example within the category of "any other remuneration promised for service." *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 672 (Md. 2001).

The Porter Parties argue that because (in their view) McKinley had no contractual entitlement to commissions for the PCG New Jersey Contract, any commissions paid to him were gratuitous and therefore were not "wages" within the meaning of the MWPCL.[12] Not all commissions are considered wages under the MWPCL—a commission is considered a wage when it has been promised as part of the compensation for service. *Whiting Turner Contracting Co.*, 783 A.2d at 672. The MWPCL protects the proper expectation of promised remuneration: "Where there is no promise, there can be no proper expectation." *Varghese v. Honeywell Int'l Inc.*, 424 F.3d 411, 420 (4th Cir. 2005). That expectation is essential to the MWPCL claim. *See Medex v. McCabe*, 811 A.2d 297, 306 (Md. 2002) (holding that employee's incentive fees were "wages due" under MWPCL where fees were "supplemental to the fixed salary as a combined measure of compensation," as distinguished from "a *bonus* for doing that which the employee is already required to do," and observing that "[t]he right to future commissions formed part of the inducement for [the employee's] initial and continuing employment.").

[12] The Porter Parties do not, at the summary judgment stage, argue that McKinley was not an employee or that his commissions were withheld based on a "bona fide dispute," *see* MWPCL § 3-507(b)(1), although D.H. Porter makes both assertions in Count I of its Amended Complaint and the former assertion in its Answer to the Second Amended Counterclaim. ECF No. 5 at 6-7; ECF No. 83 at 2, 3, 9. The remaining Porter Parties in their Answer to the Amended Third-Party Complaint similarly "deny that McKinley was an employee," ECF No. 84 at 9, and "deny any employment relationship between Third-Party Defendants and McKinley," *id.* at 2, 3, 11.

For the same reasons that the Court will deny the Porter Parties' motion for summary judgment as to McKinley's Breach of Contract Claim and will not at this stage enter a declaratory judgment that McKinley has no contract entitlement to commissions from the PCG New Jersey Contract, *see supra* Section II.A, a genuine dispute of material fact exists as to whether McKinley's commissions were earned based on a contractual entitlement or were made gratuitously. Therefore, reviewing the record in the light most favorable to the non-movant, there remains a genuine dispute of material fact as to whether the Porter Parties violated the MWPCL by withholding commissions, and summary judgment is not appropriate on these counts.

**C. Quantum Meruit**

The Porter Parties move for summary judgment against McKinley on Count III of his Second Amended Counterclaim, ECF No. 75 at 14-15, and Count III of his Amended Third-Party Complaint, ECF No. 76 at 17-18, both alleging quantum meruit and unjust enrichment.

"By its term, *quantum meruit* is a method of obtaining a reasonable value for services." *Macsherry v. Sparrows Point, LLC*, No. ELH-15-22, 2017 U.S. Dist. LEXIS 122153 at *69 (D. Md. Aug. 3, 2017) (quoting *Swedish Civ. Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002)). Per the Fourth Circuit:

> The underlying purpose of allowing quantum meruit recovery is two-fold, i.e. to prevent the breaching party from being unjustly enriched and to restore the aggrieved party in the contract to the position he occupied prior to entry into the contract. Quantum meruit merely seeks to return to the plaintiff the reasonable value of the services and goods provided to the defendant.

*Blanton v. Friedberg*, 819 F.2d 489, 492 (4th Cir. 1987) (quoting *W.F. Magann Corp. v. Diamond Manufacturing Co.*, 775 F.2d 1202, 1208 (4th Cir.1985)). The Fourth Circuit has also noted that "Maryland law distinguishes between two types of quantum meruit claims, one based on an implied-in-fact contract (usually designated as quantum meruit) and the other based on an implied-in-law contract (usually designated as unjust enrichment)." *Sanders v. Mueller*, 133 Fed. Appx.

37, 42 n.3 (4th Cir. 2005). McKinley's Second Amended Counterclaim and Amended Third-Party Complaint appear to advance both theories, *see* ECF No. 75 at 14-15; ECF No. 76 at 17-18.

Under Maryland law, "[a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Macsherry*, 2017 U.S. Dist. LEXIS 122153 at *72 (quoting *Benson v. State*, 887 A.2d 525, 546 (Md. 2005)).

By contrast, an implied-in-fact contract:

> "refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words. Despite the fact that no words of promise or agreement have been used, such transactions are nevertheless true contracts, and may properly be called inferred contracts or contracts implied in fact."
>
> "An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'" Put another way, "[a]n implied by fact contract is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services."

*Macsherry*, 2017 U.S. Dist. LEXIS 122153 at *73-74 (quoting *Mohiuddin v. Doctors Billing & Mgmt. Solutions, Inc.* 9 A.3d 859, 865 (Md. App. 2010); *Mogavero v. Silverstein*, 790 A.2d 43, 51 (Md. App. 2002); *County Comm'rs of Caroline County v. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 606 (2000) ("*Dashiell*")) (emphasis omitted).

Common to both types of claims is the principle that "generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *MacSherry*, 2017 U.S. Dist. LEXIS 122153 at *71 (quoting *Dashiell*, 747 A.2d at 610).

The Porter Parties contend that McKinley cannot claim quantum meruit or unjust enrichment because the 2020 Commission Agreement represents an express contract on the subject matter and McKinley failed to meet the express requirements of that agreement. ECF No. 107-1 at 25. However, the Court has determined that the 2020 Commission Agreement is non-exclusionary with respect to McKinley's ability to earn commissions. *See supra* Section II.A.3 of this Analysis. In other words, even if McKinley is not entitled to commissions via the 2020 Commission Agreement, neither is he barred by its terms from becoming entitled to commissions on the PCG New Jersey Contract through another means.

Because the 2020 Commission Agreement does not occupy the field with regard to McKinley's entitlement to commissions on the PCG New Jersey Contract, it does not "cover[]" "the subject matter of the claim." *See Macsherry*, 2017 U.S. Dist. LEXIS 122153 at *72. Therefore, the existence of the 2020 Commission Agreement does not bar recovery in quantum meruit—whether on a theory that McKinley conferred a known benefit related to the PCG New Jersey Contract that it would be inequitable for the Porter Parties to retain without payment; or on a theory that the parties formed a different, mutual agreement about commissions for the PCG New Jersey Contract that can be inferred through their conduct, rather than their words.[13]

[13] By contrast, if at trial the factfinder determines that the 2020 Commissions Agreement *does* entitle McKinley to commissions for the PCG New Jersey Contract at the rate he alleges, he cannot recover for *both* breach of contract and quantum meruit / unjust enrichment. However, while the latter "remedies are not available where a contract exists, . . . 'parties may plead alternative theories of liability, indeed as many theories as the facts will fit.'" *Havtech, LLC v. Allegheny Eng'g Co.*, 2018 U.S. Dist. LEXIS 205910, at *3 (D. Md. 2018) (quoting *Swedish Civ. Aviation Admin.*, 190 F. Supp. 2d at 792.) Because the Porter Parties challenge McKinley's entitlement to commissions on the PCG New Jersey Contract under the 2020 Commissions Agreement, granting summary judgment on the quasi-contract counts merely because McKinley could not ultimately recover under both contract and quasi-contract theories is not appropriate at this stage.

The Porter Parties also argue that McKinley's role in maintaining D.H. Porter's relationship with PCG was fully compensated by his salary. They argue that, because (in their view) McKinley did not "sell" the PCG New Jersey Contract, he provided no additional services related to that contract beyond those covered by his salaried duties—and thus did not confer any uncompensated benefit that would be inequitable for D.H. Porter or the Porter Parties to retain. ECF No. 107-1 at 25. McKinley, for his part, cites the December 2019 Letter, ECF No. 110-13, that offered an "additional layer of compensation for meeting certain measured targets in your department" along with the "additional compensation" referenced in the 2020 Commission Agreement, ECF No. 107-4, as evidence that he conferred a benefit related to the PCG New Jersey Contract that went beyond his salaried work, one which the Porter Parties knew of and that would be inequitable for them to retain.

The present situation mirrors that in *Macsherry*, where the dispute centered around allegedly unpaid commissions on a real estate sale. 2017 U.S. Dist. LEXIS 122153 at *73-74. There, the defendants argued that Macsherry could not recover for unjust enrichment because he did not play a substantive role in the sale and already received a salary. *Id.* The Court found summary judgment to be inappropriate due to disputes of material fact concerning Macsherry's role in the sale, such that a fact finder could conclude Macsherry provided a benefit to the defendants and "was undercompensated for that benefit because defendants failed to pay him some commission." *Id.* at 74.

Here, there exists a genuine dispute of material fact about McKinley's role in selling the PCG New Jersey Contract. *See supra*, Section II.A. As such, a reasonable fact finder could determine that McKinley was undercompensated because he had provided a benefit to the Porter Parties with respect to the sale of that contract that went beyond his salaried responsibilities, and

because the Porter Parties failed to pay him commissions in return for that benefit. For these reasons, the Porter Parties' motion for summary judgment on the quantum meruit / unjust enrichment counts will be denied.

**D. Promissory Estoppel**

The final claim at issue in the Porter Parties' Partial Motion for Summary Judgment is Count IV of McKinley's Second Amended Counterclaim, ECF No. 75 at 15-19, and Count IV of his Amended Third-Party Complaint, ECF No. 18-22, both for promissory estoppel, also known as detrimental reliance.

"[I]n Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Macsherry*, 2017 U.S. Dist. LEXIS 122153 at *64 (quoting *Maryland Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police, Inc. v. Maryland Transp. Auth.*, 5 A.3d 1174, 1227 (Md. App. 2010); *see also Suburban Hospital, Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) ("Maryland recognizes that promissory estoppel may serve as a substitute for consideration in enforcing a promise that the law would not otherwise enforce, thus making a one-sided promise into an enforceable contract by dint of the necessary reliance having been placed on it by the promisee.") (citation omitted).

Under Maryland law, the four-part test for promissory estoppel is: (1) a clear and definite promise; (2) where the promisor (here, the Porter Parties) has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee (here, McKinley); (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996). A promissory estoppel claim for money damages is a claim at law and, as with unjust enrichment claims, the general rule is that a promissory estoppel

claim cannot arise when a contract exists between the parties concerning the same subject matter. *Macsherry*, 2017 U.S. Dist. LEXIS 122153 at *65 (citing *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 772 n.9, 775 (Md. 2004)).

McKinley alleges that the Porter Parties' conduct between 2020 and June 2022—including their statements at the December 2020 Meeting and their subsequent communications through June 2022—established a clear and definite promise of commissions from the PCG New Jersey Contract; that the Porter Parties had a reasonable expectation that this promise would induce McKinley, and actually did induce McKinley, to detrimentally "[forgo] pursuit and/or consideration of potential alternative employment opportunities . . . remain in the [the Porter Parties'] employ, and . . . perform duties for the [the Porter Parties'] benefit related to the [PCG] New Jersey Contract," ECF No. 75 at 16-17; ECF No. 76 at 20.

The Porter Parties again argue that McKinley is not entitled to relief because there is an express contract on the same subject. ECF No. 107-1 at 26. This argument fails for the same reasons discussed *supra*, Section II.C: Even if McKinley is not entitled to commissions on the PCG New Jersey Contract via the 2020 Commission Agreement, he was not barred by the terms of that agreement from becoming entitled to commissions through another means. And the fact that he cannot ultimately recover on both alternative claims (breach of contract and promissory estoppel) does not mean the Court should grant summary judgment at this juncture when the Porter Parties dispute his entitlement to commissions on the PCG New Jersey Contract under the 2020 Commission Agreement.

The Porter Parties additionally argue that McKinley did not act in reliance on the promise of commissions, if such a promise existed, because he did not change his activities or suffer a detriment and because he was already paid a salary that compensated him for performing his duties

related to the PCG New Jersey Contract. ECF No. 107-1 at 26-27. However, this argument does not address the first prong of McKinley's reliance argument: that he was induced to remain in the employ of D.H. Porter rather than seek alternative employment elsewhere, in reliance on the promise of commissions. ECF No. 75 at 16-17; ECF No. 76 at 20.

Viewing the facts in the light most favorable to McKinley as the non-movant, a reasonable fact finder could determine that the Porter Parties' statements and conduct constituted a clear and definite promise that McKinley would receive commissions from the PCG New Jersey Contract; that the Porter Parties had a reasonable expectation that this promise would induce McKinley to remain at D.H. Porter rather than pursuing other employment opportunities, and / or to perform additional services related to the PCG New Jersey contract beyond his salaried role; and that McKinley relied on these promises to his detriment by in fact forgoing other employment opportunities and / or performing work beyond his salaried role. As such, summary judgment is inappropriate as to McKinley's promissory estoppel claims.

## IV. CONCLUSION

For the foregoing reasons, the Porter Parties' Partial Motion for Summary Judgment (ECF No. 107) is denied in all respects. A separate Order follows.

Date: September 30, 2026

*/s/*
Douglas R. Miller
United States Magistrate Judge